THEODORE BYRNE *et al.*, Plaintiffs-Appellees, v. SCM CORPORATION *et al.*, Defendants and Third–Party Plaintiffs-Appellants (Construction Service & Supply, Inc., Defendant and Third-Party Plaintiff; Carle Foundation Hospital, Third–Party Defendant-Appellee).

Fourth District No. 4—88—0572

Opinion filed May 4, 1989.—Rehearing denied June 13, 1989.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (D. Kendall Griffith and Nancy G. Lischer, of counsel), for appellants.

Phebus, Tummelson, Bryan & Knox, of Urbana (Hurshal C. Tummelson and Joseph W. Phebus, of counsel), for appellees Theodore Byrne and Diane Byrne.

Craig J. Causeman, of Thomas, Mamer & Haughey, of Champaign, for appellee Carle Foundation Hospital.

JUSTICE SPITZ delivered the opinion of the court:
This action was brought in the circuit court of Champaign County

by plaintiffs Theodore and Diane Byrne against defendants SCM Corporation and Glidden Coating and Resins, a division of SCM, and Construction Service and Supply, Inc., the manufacturer and distributor of an epoxy paint, to recover damages for injuries sustained when Ted used defendants' product as part of his job as a painter for the Carle Foundation Hospital (Carle). Plaintiffs originally filed a complaint alleging several counts in negligence, strict liability, and wilful and wanton misconduct, but dismissed all but the strict liability counts prior to trial. The defendants filed a third-party action for contribution against Carle.

On the first day of trial, the plaintiffs received leave to amend their complaint to include violations of a State statute and a Federal regulation. Defendants objected to the timeliness of the late amendment, which raised a new theory on the first day of trial. The defendants' motion to strike these portions of the amended complaint was denied. The plaintiffs conceded at the close of evidence that the Federal regulation did not apply to their claim and this allegation was stricken on the defendants' motion. The trial court instructed the jury as to the State statute which requires a manufacturer who sells toxic substances in turn to supply to the purchaser a material safety data sheet within 30 days of the receipt. Ill. Rev. Stat. 1987, ch. 48, par. 1411.

The third-party complaint was set out in six counts. Counts I, II, and III were contribution claims by Construction Service and Supply, Inc., and, since the distributor is not a party to this appeal, there are no issues raised as to these counts. Count IV is the manufacturer's claim for contribution against Carle based upon allegations of the employer's negligence. Count V is based on allegations of the employer's misuse of the product, and count VI is premised upon allegations of the employer's assumption of risk.

On October 2, 1987, Carle filed a motion to dismiss this second-amended third-party complaint. After hearing arguments of counsel, the court entered a written order on October 5, 1987, dismissing with prejudice counts II, III, V, and VI of the second-amended third-party complaint and striking subparagraph 10(c) of the remaining counts. On October 5, 1987, Carle filed an answer to the remainder of the third-party complaint.

However, on October 8, 1987, Carle filed a motion for summary judgment with voluminous exhibits. On October 14, 1987, defendants filed a notice of filing discovery depositions in opposition of third-party defendants' motion for summary judgment, listing the discovery depositions of Charles Woolridge and Richard Peters, two of Ted's fel-

low employees. The defendants also attempted to tender portions of the depositions of James Glaze and Susan Johnston, two of plaintiffs' experts, at the hearing on the motion, which occurred after the trial had begun. After hearing arguments of counsel, the trial court made the following findings, which the court subsequently expressed in a written order filed October 28, 1987:

"1. The Court adopts the argument advanced by the Third-Party Defendant that the seven subparagraphs of Third-Party Plaintiff's Second Amended Complaint allege only two theories of recovery founded upon the issues of ventilation and respiration.

2. The Court grants the Motion by Third-Party Defendant to strike the tender by Third-Party Plaintiff of the deposition excerpts of James Glaze and Susan Johnston as untimely.

3. The Court finds that Third-Party Plaintiff failed to adduce any evidence in opposition to the Motion for Summary Judgment to support the contention that the Third-Party Defendant knew or should have known that any or different respiration was necessary under the circumstances of this case. The Court, therefore, grants the Motion for Summary Judgment as to each Count of the Second Amended Third-Party Complaint, as more particularly set forth in Paragraph 10, subparagraphs (e)—(h).

4. The Court grants the Motion for Summary Judgment as to each Count of the Second Amended Third-Party Complaint, as more particularly set forth at Paragraph 10, subparagraph (d), but only as said subparagraph relates to respiration.

5. The Court finds after consideration of the opposition to Motion for Summary Judgment that there is a genuine issue as to a material fact on the issue of ventilation, and accordingly, the Motion for Summary Judgment directed to Paragraph 10, subparagraphs (a), (b) and the portion of subparagraph (d) referencing 'ventilation,' is, therefore, denied."

The trial court stated that in making the ruling, the court considered only the filings made by defendants in opposition to the motion for summary judgment, neither of whom were experts.

The facts brought out at trial follow. Ted is a 36-year-old painter who had been employed at Carle for a period of approximately five years prior to October 15, 1984. He is married to Diane and they have three children. His earnings at Carle during 1983 were $23,000 to $25,000. Prior to October 15, 1984, Ted was a healthy man. He worked every day and participated in athletics, including baseball and

bowling. He played basketball with his children. The family had a boat and a camper, and they did a lot of camping and boating.

On October 15 and 16, 1984, Ted was painting the pathology lab using Glid-Guard epoxy paint, manufactured by defendants SCM Corporation and Glidden Coating and Resins, a division of SCM (Glidden Coating), and ultimately sold by the defendants' supplier, Construction Service and Supply, Inc., to Carle.

The epoxy paint which the plaintiff used came in two separate containers and the two components were then mixed. Under the name of the product, the label for component A advised that the breathing of vapors might be harmful, and directed the user to the cautions on the side. It stated:

"WARNING! FLAMMABLE PAINT! VAPOR HARMFUL!<br>See Cautions on Side Panel"

The word "warning" was in enlarged letters. On the side panel, the label warned:

"WARNING!<br>FLAMMABLE!<br>VAPOR HARMFUL<br>CONTAINS METHYL ETHYL<br>KETONE AND TOLUENE

**Keep away from heat, sparks and open flame. Avoid prolonged contact with skin and breathing of vapor or spray mist. In case of skin contact wash thoroughly with soap and water. Eye contact flush immediately with water for at least 15 minutes. Get medical attention.**

*Use Only With*<br>*Good Ventilation.*<br>**KEEP OUT OF THE REACH OF CHILDREN"**

(Emphasis in original.)

The statement "Use Only With Good Ventilation" was the only printing which was in italics. The directions on the component A can stated:

"APPLICATION

**Mix as Directed. Apply liberally and uniformly. See Glidden representative for specific recommendations on equipment and conditions governing application by conventional or airless spraying. Do not apply on putty coat plaster. Air-supplied respirators should be worn during application in confined areas without good ventilation."**

The component B can also contained warnings. Like the first can, there was a warning underneath the product name which advised:

"WARNING! FLAMMABLE PAINT! VAPOR HARMFUL!
See Cautions on Side Panel"

Again, the word "warning" was in larger letters than the other print. It also had another warning under the product label which stated:

"WARNING!
Contains ETHYLENE GLYCOL MONOETHYL ETHER

Wear impervious clothing and equipment to prevent eye and skin contact. Exposure controls may require use of a NIOSH approved combination vapor/particulate or supplied air respirator. Reproductive and blood disorders and birth defects have been observed in tests on laboratory animals with ethylene glycol monoethyl ether."

The side panel provided:

"WARNING! FLAMMABLE!
VAPOR HARMFUL CONTAINS
METHYL ETHYL KETONE
AND GLYCOL ETHERS

Keep away from heat, sparks and open flame. Avoid prolonged contact with the skin and breathing of vapor or spray mist. In case of skin contact wash thoroughly with soap and water. Eye contact flush immediately with water for at least 15 minutes. Get medical attention.

USE ONLY WITH
GOOD VENTILATION
KEEP OUT OF THE
REACH OF CHILDREN"

The directions specifically referred the user to the other label for directions on the product's use.

The labels were seen by Richard Peters, the plaintiff's fellow painter. The labels were not obscured and could be read.

Three expert witnesses, Gilbert Elenbogen, James Glaze, and Susan Johnston, were called to testify by plaintiff. Elenbogen has a master's degree in chemistry, and a master's degree in environmental engineering, and is presently a research chemist with the Metropolitan Sanitary District of Chicago. He is familiar with epoxy paints and material safety data sheets used in determining the protection, if any, required for the use of a manufacturer's product. He had reviewed the Glid-Guard epoxy paint labels and the material safety data sheets, and in his opinion, it was not reasonably safe to use this paint outdoors without any respiratory protection because of the vapors. These paints contain toluene, methyl ethyl ketone, and glycol ethers which are known to be toxic and can cause irreversible damage. In his opin-

ion, it would not be reasonably safe in an indoor setting to use an absorbent respirator. It is also Elenbogen's opinion that the use of the expression "Use Only With Good Ventilation" was not clear enough, as this statement does not say what good ventilation is and does not advise any specific kind of mask. Elenbogen opined that under all conditions some mask would be required, even if there were a very good air supply. Elenbogen testified the use of the terms, "exposure controls may require use of a NIOSH [National Institute of Occupations Safety and Health] approved combination vapor particulate or air-supplied respirator," is not sufficient. Based upon his experience, its use is absolutely essential.

According to Elenbogen, the information contained in material safety data sheets provided that at the minimum a NIOSH-approved chemical-mechanical filter respirator must be used, and in confined areas the use of approved air-supplied equipment was mandatory. The label on the cans of epoxy paint was ambiguous and did not require the use of any specific safety equipment. In Elenbogen's opinion, the product was unreasonably dangerous as labelled if there was a failure to supply the material safety data sheet. He has read published material which indicates inhalation of solvents, the MEK (methyl ethyl ketone), the toluene, or propylene glycol ethers can cause brain damage and central nervous system damage.

Johnston received her master of science degree in organic chemistry at the University of Illinois and is employed by the Army Corps of Engineers. She has tested probably 200 samples of epoxy paint and has taken standard formulations or recipes for epoxy paint and added modifying agents. She had an assignment for a period of about two years to develop a very durable tough coating in a project funded by the Navy. Her title is that of "Paint Chemist," and she has been appointed the "Hazardous Materials Action Officer" in her division at the United States Army Corps of Engineers Construction Engineering Research Laboratory.

She is familiar with material safety data sheets and works with them in her work. She has reviewed the label and material safety data sheet for Glid-Guard epoxy paint to determine the specific contents. In her opinion it would not be a safe practice to use Glid-Guard epoxy paint without a respirator because several of the solvents in the paint are harmful, and a safe practice would require at least the use of an organic vapor cartridge anytime while using those paints.

Glaze is a safety engineer for Granite Construction Company and has a doctorate in the specialized area of environmental health and safety. He was a United States Air Force officer, pilot, and safety of-

ficer for 20 years. He was chief of specialized safety for products sold to the United States government and worked with a wide variety of products with approximately 900 contractors. He worked with paint, and labeling of the product was part of his work. He was safety coordinator for six years at the University of Illinois, where he conducted courses on the Occupational Safety and Health Act (29 U.S.C. §651 *et seq.* (1982)) and audited and inspected campus laboratories and facilities for safety and fire hazards.

According to Glaze, material safety data sheets spell out the peculiarities or hazards and the precautions for different types of material such as paint and any other material that might present some hazards to the user. He reviewed the label and the material safety data sheet for the epoxy paint and, assuming neither the manufacturer nor the supplier provided Carle with a material safety data sheet, then in his opinion it would be a major detriment to the ability of the employer to carry out necessary safety provisions regarding that sheet. The employer might not be aware of the hazards of the chemicals or the specifics of what safety protection might be required, such as a respirator or any other type of specific safety equipment. In his opinion, it would be quite significant not to have the material safety data sheet on such an item. In addition, it is his opinion that the absence of any specific definition of "Good Ventilation" means it is open to interpretation. For one person it might mean to open up the window, to others use a large fan, and to others it might mean something else. The labels do not say the paint should not be used without some sort of filter, and the label does not specify what kind of filter should be used. In his opinion as a safety expert, the label contains no guidance as to when one type of mask would be adequate and when the other type would be needed. It is also his opinion that the use of the word "may" in the label is inadequate. The Occupational Safety and Health Administration (OSHA), NIOSH, and MSHA (Mine Safety and Health Administration) delineated "shall" as being a positive word saying "you will do this." The agencies left out the soft optional choices like the word "may" in most all of their literature. The use of the word "may" allows someone to interpret what he thinks is appropriate. Based upon a reasonable degree of scientific certainty as a safety expert, Glaze opined the labeling is inadequate. It does not guide a person using it. It does not guide the company that purchased the paint. The emphasis of the label seems to be focused more on flammables. The label's use of "may," "should," or "good" could allow conscientious persons to conclude an open window or some ventilation would be adequate without utilizing a respirator, or certainly not the proper

type of respirator. Based on his knowledge and experience as a safety expert, there are no circumstances where this product may be used safely without some form of respiratory protection.

Glaze believes a product can be rendered unreasonably dangerous due to inadequate labeling and instructions and the labels in this case were extremely inadequate, making the product unreasonably dangerous. For this reason it was necessary to furnish the material safety data sheets. Even if the user had both the label and the material safety data sheet, there could still be confusion because of the conflicting information.

The "Protective Maintenance Coatings Data" for Glid-Guard epoxy paint published by the defendant in January 1984 provides that in open areas a paint spray mask with approved chemical-mechanical filter is required and in enclosed or confined areas a NIOSH-MSHA-approved supplied-air respirator is required. The material safety data sheet for the Glid-Guard requires the use of a NIOSH-approved respirator with a chemical-mechanical filter, and in confined areas, approved supplied-air apparatus or equipment.

A copy of a later label used on the same Glid-Guard epoxy chemical paint published by the defendant in 1983 states in part:

"In open areas use paint spray mask and approved chemical-mechanical filter. In enclosed or confined areas use NIOSH/MSHA approved supplied air respirators."

The labels on the epoxy paint cans in question use the expression:

"[E]xposure controls may require the use of a NIOSH approved respirator."

James Sainsbury, product manager with Glidden Coating, testified the labels of Glidden paints are prepared by a committee of which Sainsbury is a member. The ultimate decision as to what label would be used would probably be made by the company's law department.

Sainsbury acknowledged the Protective Maintenance Coatings Data published by the company in January 1984 provided for the use of a paint spray mask and approved chemical-mechanical filter in open areas and in enclosed or confined areas required supplied-air respirators. He identified labels on the paint cans involved in this litigation, the material safety data sheets for the product involved, and the more recent label on the defendant's epoxy paint cans commencing in 1983. Sainsbury stated he did not know why the label on the cans in question did not require the use of the chemical filter mask or the air-supplied respirator except that his company had carried that label for over 30 years. The language on the labels was changed in 1983. He was in charge of the label committee in 1983, and the change in lan-

guage would have gone through the committee. However, he does not recall the language on the label of four years previous, and he does not know the reason for the change. The labeling committee has several members on it and no single member is familiar with all aspects of the label. So, Sainsbury would not be familiar with all of the information that may have been available to other members of the committee. Sainsbury has never had occasion to become familiar with NIOSH-approved respirators, and when somebody came up with the expression NIOSH-approved respirators, he did not make any inquiry. As far as he knows, no one on the committee made any inquiry as to what it meant. He further testified he is not familiar with what NIOSH specifies as being required equipment for the safe use of this particular type of material.

On October 16, 1984, Anna Kennel, a nurse practitioner working at Carle's employee health department, observed Ted come to the health department. He said he was having difficulty breathing, was dizzy, and suffered from a headache. Kennel called medical assistant Alice Dollahan, and they placed Ted in a wheelchair and took him to the emergency room. She learned later that he had been admitted to the hospital.

Diane testified that on October 16, 1984, she went to Carle's emergency room, where she saw Ted. He was gasping for air and seemed as if he was in another world. Dr. David Main was there at the time and the staff was doing all types of tests and started intravenous treatment. At about 4:30 or 5 p.m. Ted was taken to a hospital room. She went with him but he was not communicating with her. He was being given oxygen and he just slept. She stayed with him until about 9 p.m.

Ted remained in the hospital overnight and Diane returned to the hospital the next morning and waited for Dr. Main. She did not remember how Ted got along that night. She believes he went back to work a day or two later and she observed him working.

On approximately October 20 she saw her husband holding on to a paint cart as if he was unable to stand while painting. He had a mask on and some "weird" clothing. Subsequently Ted was hospitalized at Burnham Hospital under the care of Dr. Isaac Morhaim. Diane saw Ted while he was at Burnham Hospital. He was given oxygen and he laid there quietly. He just was not talkative. He was still gasping for air. One doctor advised he could return to work, and one said he could not return to work. He has never returned to work.

Ted lost between 35 and 40 pounds, and he has a lot of depression and anxiety. Since the incident, he has not had any interest in things.

Their marital relationships have been affected. He does not play baseball. He stutters and repeats himself over and over. His ability to walk and use his hands varies.

Ted returned to Dr. Simeon Grater, at Carle, for treatment, although he has been seen periodically by Dr. Morhaim. Following the initial period, Ted can button his shirt and get his pants on most of the time, but they might be crooked. He cannot be trusted alone.

During 1986 Ted continued to lose weight and his condition did not change. He was hospitalized in 1986 and was on Haldol twice a day. In 1986, he was sent to the Mayo Hospital and Clinic in Rochester, Minnesota. Diane was there with Ted for four or five days, and Ted did not get along well at all.

Ted's medication was changed from Haldol to Librium. He was very nervous and seemed mentally worse. He was still under the care of Dr. Grater, who put him back on Haldol. This seemed to make him a little better for a few days, but then he got worse again. According to Diane, Ted has had trouble with his hands, and he walks differently.

Dr. Isaac Morhaim has practiced medicine in Champaign County, Illinois, since 1957. He is on the staff at Burnham and Mercy Hospitals. He first saw Ted on October 19, 1984, and Ted gave him a history of doing some painting at Carle with epoxy paint on October 15 and 16 when he became dizzy and goofy. He was told by his boss to go back to painting with the epoxy paint. At the end of the second day he went to the emergency room, was examined, and then hospitalized, at which time the doctor told him it would be a good idea to stay away from the paint. One of the reasons that he came to see Morhaim was because he had been asked to go back to work. Ted went to Morhaim, a general practitioner, at his attorney's suggestion. He had never seen this doctor before.

Morhaim listened to the plaintiff's lungs because the patient was wheezing and his lungs were full of fine rales. Ted was advised to be hospitalized at Burnham Hospital and he was hospitalized there on October 22. His hospitalization extended from October 22 to October 26, and during that time a number of tests were performed. Morhaim called upon two consultants, Dr. Tsing-Yun Chiang, a neurologist, and Dr. James LeGrand, a pulmonary specialist. LeGrand performed a bronchoscopy and reported a severe restrictive and obstructive ventilatory defect due to airway disease and probably acute interstitial injury resulting from recent epoxy toxic inhalation. LeGrand diagnosed Ted's lung condition to be acute respiratory distress due to hydrocarbon intoxication, a high epoxy. Morhaim also formed a diagnosis, to a

reasonable degree of medical certainty, as to the condition of Ted's central nervous system. Based on Chiang's report, Morhaim's diagnosis was that Ted had acute toxic encephalopathy. Morhaim felt this condition was related to the exposure because of the timing of the symptoms, which timing was reported by the patient. Morhaim stated he would defer to a neurologist's opinion regarding Ted's condition since he is not a neurologist and this is the only case he has had involving toxic exposure.

Morhaim saw Ted again after he got out of the hospital. On November 2, Ted was wheezing, short of breath after jogging, had a real fast heartbeat and had fine rales throughout the lungs. Ted was sent to Burnham for breathing treatments three times a week.

Morhaim continued to see Ted periodically while he was under treatment at Carle. Morhaim formed an opinion, based upon his treatment of the patient and the history obtained, that to a reasonable degree of medical certainty, Ted's exposure to the epoxy paint damaged his brain, Ted having developed toxic chronic encephalopathy due to the exposure to the epoxy paint in an enclosed room where he was painting on October 15 and 16, 1984. Morhaim's prognosis for Ted is not good. He believes the chronic toxic encephalopathy is permanent in nature. He saw Ted on September 11, 1985, and he feels Ted is not capable of performing the occupation of a painter or of taking care of his own affairs.

On December 6, 1984, Ted began seeing Dr. Simeon Grater of Carle Clinic, and remained under his care and the care of the other physicians at Carle until May 1987, when the plaintiffs moved to Leesburg, Florida, where Ted's sister lives.

Grater, a psychiatrist, along with other doctors at Carle, treated Ted during this entire period, with Grater being the principal physician in charge of Ted's case. Grater's diagnosis is that Ted is likely to have an organic brain syndrome of unknown causes. An organic brain syndrome is defined as psychological or behavioral abnormalities associated with transient or permanent dysfunction of the brain. While psychiatrists do not use the term "encephalopathy," that term would mean something wrong with the brain due to some toxicity that would be chronic in nature. That would be one type of organic brain syndrome.

Grater reviewed Ted's chart and testified that there is absolutely no mention prior to October of 1984 of any disordered thinking or any aberrant mental behavior or any complaint of any aberrant physical behavior. His prognosis was that Ted would most likely continue to have problems for a long while, that his mental status would vary and

that he would be subject to a much reduced level of functioning. Ted might have episodes of depression and episodes of weight loss from feeling unable to do things he wanted to do. His prognosis was poor. Grater felt it possible that the patient would have marital problems and he would need constant supervision as a result of his condition. Grater also stated his opinion that Ted's condition would probably remain permanent and that his deficits were global in nature, totally distorting every aspect of his life.

Grater testified that in his opinion, based on a reasonable degree of medical certainty, the exposure to the epoxy paint fumes on October 15 and 16, 1984, might or could be the cause of the condition which he diagnosed. The chronic brain syndrome was most likely related to his exposure to the fumes. That was the highest on his list of possible etiologies. He could not testify with a reasonable degree of medical certainty that Ted's condition was related to the exposure and testified that another possible diagnosis was that the behavior was consciously motivated. He felt the workup by the Mayo Clinic was as thorough as was possible. The results from Mayo made him question if he had been duped by the plaintiff. Even though he believed that there had been some sort of organic brain damage, he refrained from definitively stating that it was related to the exposure, instead insisting that it was of unknown etiology. Other doctors also testified that conscious motivation was a possible diagnosis, although none definitively diagnosed conscious motivation as the cause for Ted's condition. When asked if anything organically wrong was found with Ted, Grater testified that as of August 27, 1986, there had been an elevated thyroid function and that pulmonary studies were not normal.

Plaintiff had gone to Mayo Clinic in Rochester, Minnesota, for evaluation and diagnostic testing. There, he was seen by Dr. Bruce R. Krueger, who is board-certified in adult neurology by the American Board of Psychiatry and Neurology and certified by the American Board of Qualification in electro-encephalography. Krueger could not find any physical, neurological, or organic basis for plaintiff's symptoms. If the plaintiff had encephalopathy, there would have been abnormal test results, including "significant massive changes in brain wave activity, x-ray findings and very specific psychometric changes."

Instead, all of the results of tests were normal, including four electroencephalograms (EEG). Other tests conducted at Mayo were: special pulmonary function testing, speech consultation, psychology consultation, psychometric testing, psychiatric consultation, and tests by a specialist in occupational and environmental medicine. All laboratory tests on the urine and blood also had normal results, as did plain-

tiff's CAT scan.

According to Krueger, a person cannot have encephalopathy or organic brain damage without objective findings on the tests supportive of that diagnosis. Further doubt concerning the plaintiff's alleged brain damage arose due to plaintiff's normal responses and actions when he was not being tested or observed. Krueger found multiple inconsistencies during the evaluation.

First, the plaintiff claimed to function poorly, but all of the tests were normal. Secondly, when the doctor was in the process of evaluating the plaintiff, his speech was slow and childlike. However, when they were walking down the hall or the formal interview was over, the plaintiff's speech was normal and quick. Thirdly, although the plaintiff appeared to not take notice of conversation around him, when the doctor explained to the plaintiff's sister what the test results were, the plaintiff snapped at the doctor "well, what's wrong with me then," at an appropriate time in the conversation.

The fourth inconsistency was that during the examination, the plaintiff's breathing was labored and rapid. However, when the plaintiff was asleep in his room, his respiration was normal. This is a major inconsistency since a person cannot control his breathing while sleeping. The fifth inconsistency was while the plaintiff was observed, he demonstrated difficulty dressing. When the plaintiff was observed without his knowing, he had no problem getting dressed. The sixth inconsistency was that if the plaintiff had encephalopathy, then there would have been certain reflexes which would have been affected. The plaintiff's involuntary reflexes tested normal. According to Krueger, plaintiff's behavior was not consistent with encephalopathy.

There had been some question whether Ted's behavior was caused by his taking a certain medication. However, Ted's behavior could not be attributed to the medication because his muscle tone was normal and he blinked normally.

Dr. Steven M. Juergens, also from Mayo, is board-certified in psychiatry and neurology. Juergens was unable to form a diagnosis of chronic encephalopathy to a reasonable degree of medical certainty. There had been psychological tests run which were normal. When the plaintiff was actually being examined he would fail to answer to his own name, but when plaintiff was engaged in conversation, it was rarely necessary to repeat questions. During a testing period plaintiff's use of his hands was abnormal, but after the doctor left the room and observed the plaintiff without his knowing, the hand use was normal. During evaluation, plaintiff could not comb his hair. The doctor left the room, observed plaintiff without his knowing it, and

saw the plaintiff comb his hair with ease. These inconsistencies in the plaintiff's behavior go against a diagnosis of encephalopathy. Juergens agreed with Krueger's opinions. He suggested further hospitalization to evaluate the plaintiff's condition, but plaintiff refused.

The statement of Dr. Stanley C. Glauser, an unavailable witness, was read to the jury. Glauser is a medical doctor who specialized in pharmacology and toxicology. According to Glauser, although Ted's symptoms are real, they are not related to exposure to the epoxy paint. If the plaintiff had been adversely affected by the exposure, a number of symptoms would have appeared, including severe muscle weakness, abnormal nerve conduction, a grossly abnormal liver, kidney failure, and hemolytic anemia with hemoglobin or bilirubin in the urine. The plaintiff showed none of these effects.

The brain is the last organ to be affected by exposure to these toxic substances. If there had been brain or central nervous system damage, there are tests to determine if the brain were affected. An EEG, nuclear magnetic imaging, CAT scans, and lumbar punctures would all show abnormal results if there had been central nervous system damage. The plaintiff's subjective complaints were all related to the central nervous system, but none of the objective tests showed any abnormality. Every possible diagnostic test was performed on the plaintiff and all of them were normal.

Although Glauser could testify he had not determined whether Ted's condition was biologically induced or whether Ted was faking the symptoms, the reasons he did not have such an opinion was because the plaintiff refused to be further evaluated at Mayo Clinic under a controlled environment. Even though the doctors at Mayo suggested that Ted undergo further evaluation and testing, the plaintiff refused.

Dr. Walter Dennis Tobin was one of the Carle physicians called by the defendants. He is a neurologist and he first saw Ted on December 6, 1984. He reviewed Ted's files and noted Grater's diagnosis as chronic organic brain syndrome due to toxic exposure. He also talked to Diane and felt that she was honest and did not attempt to mislead him or embellish Ted's condition. The tests conducted by Tobin all resulted in normal findings and there was no medical evidence showing there had been brain damage. Tests were given to the plaintiff for which Tobin felt it was impossible for the patient to fake the results and, from these results, Tobin concluded plaintiff may have an organic brain syndrome, but there was a strong element of added functional overlay, possibly due to conscious malingering or to a conversion reaction or psychosis. If there had been encephalopathy from exposure to

the epoxy paint, the neurological test results would have been "floridly abnormal." It is impossible to have chronic toxic encephalopathy without organic damage to the brain, and he is unaware of any such damage which would not be shown on the tests.

In Tobin's opinion, Ted's initial functions may have been due to a central nervous system toxic exposure and his later functional level could be due to a psychological illness as a reaction to the initial event. He further testified that a person could have a chronic toxic encephalopathy without having a lesion such as a blood clot, stroke, or tumor or structural abnormality which would be discernible by tests.

He reviewed the reports from Krueger. Tobin stated the reports make no allusion to a definitive psychiatric diagnosis as to causation, but concluded that to the best of Krueger's ability, neurologically, Krueger did not think Ted had an irreversible nervous system problem.

Tobin disagreed with Grater's diagnosis of organic brain syndrome. According to Tobin, Ted might indeed have had an acute toxic exposure from which he partially recovered, but later he had superimposed psychological reactions to his illness. Tobin felt it is highly unlikely that the severity of Ted's mental status deficit, which persisted for a long time, and even got worse later, was due to some delayed effect of the toxicity, but rather was probably a superimposed secondary depressive reaction or hysterical conversion reaction. Tobin felt this is an important distinction.

In addition to the medical evidence, several witnesses testified about the working conditions, Ted's knowledge of the dangers of using the paint, and Ted's activities following the incident. On the day before the assignment to paint the laboratory, Ted told Charles Woolridge he had read an article about epoxy paint and he knew it was dangerous to use without proper ventilation. He thought it was hazardous to use epoxy because he did not have a proper mask.

According to Richard Peters, another painter at Carle, Ted complained to hospital supervisors that the mask provided by the hospital was not working and requested a new mask. The hospital refused to provide one. The painters did not have a choice in the mask since the hospital only had one type. Ted had complained about the mask six months before. The trial court refused to allow testimony concerning the content of plaintiff's complaint six months earlier or whether the plaintiff ever indicated he needed a different organic vapor respirator because he thought fumes would be dangerous to his health on the ground defendants were trying to prove contributory negligence in a strict liability case. The hospital did not provide charcoal filters for

the mask. Instead, they only provided a cotton filter. They did not provide any instructions on the use of that mask. The condition of the mask, according to this painter with 17 years' experience, was fair to poor.

There was evidence that plastic sheeting was placed over a window and that one air duct was blocked off. However, there was testimony by another witness that the air ducts were not obstructed where Ted was painting and that air was actually being exhausted through those ducts. The hospital provided a fan constructed by the carpenters to collect sawdust. This fan did not exhaust the air from the pathology lab, but simply collected dust particles and exhausted the same air back into the room.

The evidence did not conflict as to whether the ventilation in the pathology lab was sufficient. Johnston stated two air exchanges were insufficient ventilation to paint without a chemical filter mask. Glaze testified that 30 air exchanges per hour was good ventilation under ordinary painting conditions, and Elenbogen testified that two air exchanges per minute was good ventilation, but he would still require a filter mask for safe use of this product. There was other testimony that good ventilation for ordinary use would be one air exchange per minute. However, there was no testimony about the air exchange rate in the pathology lab.

This was not the first time Ted had used epoxy, and he was aware that use of this product without adequate ventilation and without a proper mask was dangerous. As he was painting, he had headaches, was dizzy, and had an upset stomach. His complaints started at least by midday of the first day of painting. He told his doctor that on the first day he felt "dizzy and goofy," but he still painted the second day. Despite his complaints, plaintiff continued to paint.

There had been talk in the hospital about the odor. Peters testified he found plaintiff painting that morning with the door closed and the vent blocked off. He told plaintiff he should leave. The maintenance supervisor testified he observed plaintiff painting without the mask the hospital provided. He also testified that he told the plaintiff to stop working until the ventilation system cleared the room of odors.

The room that the plaintiff painted would take about one gallon and several hours to paint. The evidence conflicted whether the plaintiff painted both days. His fellow painter stated that the first day was spent preparing the room for painting by patching and priming with latex paint, and not using the epoxy. Another witness testified that plaintiff painted with epoxy on the first day as well. Plaintiff did not

apply the epoxy with a spray gun, but by roller and brush. He did not complete painting the room. After the 2 p.m. break on the second day, the plaintiff went to the employee health center.

Concerning Ted's activity following the incident, Grater testified that, based on what he saw of the plaintiff, he would be "astounded" if the plaintiff could drive an automobile. If he learned the plaintiff could drive, this would rule in favor of concluding Ted was consciously malingering. In fact, the State of Illinois was petitioned to have the plaintiff's driver's license revoked for this reason. Tobin also testified he would be "extremely surprised" if the plaintiff was capable of driving 30 miles, negotiating a parking lot and parking the car between two other parked cars.

According to Diane, plaintiff had only driven alone on a couple of occasions. However, videotapes were taken showing the plaintiff driving on a divided highway or interstate, with his hand casually draped over the top of the steering wheel. It shows the plaintiff capable of keeping up with the traffic, passing other vehicles and driving without a problem. A person who was in the car at the time, not a family member, testified that while plaintiff was driving there were no accidents. At the time this video was taken, the destination was a restaurant in Covington, Indiana, about a 100-mile round trip. Apparently, somewhere between Champaign and Covington, Diane pulled the car off the road and let Ted drive. On the return trip, Ted drove part of the way and then stopped the car to allow Diane to resume driving.

An investigator observed Ted driving one day. A local police officer also testified he saw Ted on three different occasions driving around town in a normal fashion. He observed nothing remarkable about Ted's driving. After moving to Florida, the plaintiff was again seen driving alone in a normal fashion.

There was also evidence Ted received a traffic citation for speeding in Georgia, which listed the Illinois address. The citation was offered into evidence. The officer, who cited the plaintiff, testified Ted had been driving over 70 miles per hour in a 55 miles-per-hour zone. The driving was not abnormal, erratic, or dangerous in any other way. The operator of the vehicle had no problem slowing down and pulling off onto the side of the road after the trooper signalled him to stop. There was nothing unusual about the operator's behavior, speech, or movements. The trooper did not have to assist the driver in any way, such as with the removal of the driver's license. The trooper verified the identification of the person driving by comparing the picture on the license and checking the description as listed on the license. They all matched. The ticket was paid. At trial, Ted produced the license,

which was marked as an exhibit. Diane denied that plaintiff left the State of Illinois during this time period.

There was similar contradictory evidence concerning Ted's ability to work normally, and to speak normally and be involved in a conversation, to mow the lawn, and wash cars. There was also evidence concerning Ted's use of an assumed name and the change of his appearance, including the color of his hair. While Diane admitted Ted used another name, she denied he changed his hair color.

At the close of all the evidence, Carle's attorney made an oral motion for a directed verdict as to the ventilation issues on which summary judgment had not been granted. The court heard arguments of counsel. After considering the arguments of counsel and the evidence presented in the case, the trial court granted Carle's motion for a directed verdict. Also before submitting the case to the jury, the trial court directed a verdict in favor of plaintiffs and against defendants on the two affirmative defenses, misuse of the product and assumption of risk. The jury returned verdicts in favor of Theodore Byrne for $1,025,000 and in favor of Diane Byrne for $62,000. Defendants appealed.

■ The first issue to consider on appeal is whether the evidence is sufficient to support the verdicts. This issue has two subissues: (1) whether plaintiffs proved a *prima facie* case of strict products liability against defendants, and (2) whether the verdicts are against the manifest weight of the evidence. In determining whether the verdicts are against the manifest weight of the evidence, the reviewing court must be convinced that the opposite result is clearly evident from a review of the record. The test is whether the result reached by the jury was reasonable, based on the evidence. (*Chizmar v. City of Virden* (1987), 162 Ill. App. 3d 653, 515 N.E.2d 1294.) If the verdict has evidentiary support in the record, the reviewing court will not substitute its judgment for that of the jury. (*Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 458 N.E.2d 530.) It is obvious from a review of the facts that the plaintiff proved a *prima facie* case, and the jury's verdicts are sufficiently supported by the evidence and cannot be said to be against the manifest weight of the evidence.

■ As in any cause of action, in a strict liability action plaintiff must plead and prove facts supporting each element of the cause of action. In a strict liability case, plaintiff must prove: (1) plaintiff was injured or his property damaged; (2) the injury or damage resulted from a condition of defendant's product; (3) the condition was an unreasonably dangerous one; and (4) the condition existed at the time it left the manufacturer's control. *Vuletich v. Alivotvodic* (1979), 73 Ill.

App. 3d 927, 392 N.E.2d 663.

In arguing plaintiffs failed to prove a *prima facie* case, defendants raise five contentions. These contentions are: (1) plaintiffs failed to plead and prove defendants knew or should have known of the danger; (2) there was no duty to warn since Ted was aware of the danger and knowingly used the products; (3) the warning was adequate as a matter of law; (4) plaintiffs failed to prove the injury was proximately caused by the failure to warn; and (5) Ted's injury and its causative connection to exposure to the product was not established by competent medical evidence.

■ The failure to warn at all or to adequately warn of a product's dangerous propensities may serve as the basis for holding a manufacturer strictly liable because the "defective condition" is the lack of an adequate warning accompanying the product. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194.) In a failure to warn case, there is the additional element which must be pleaded and proved: defendant's knowledge of the defect. In *Woodill*, the Illinois Supreme Court required the plaintiff to plead that defendant knew or should have known of the product's dangerous propensity in cases where failure to warn is alleged.

■ Although plaintiffs do not explicitly plead defendants knew or should have known of the danger, such an allegation is implicit in facts alleged in the amended complaint. Plaintiffs allege defendant manufactured the paint, it was unreasonably dangerous, and defendant gave inadequate warnings and instructions. If defendant gave warnings and instructions, then defendant must have known of the dangerous condition. Therefore, the pleadings are sufficient. And, for the same reason, so is the proof.

Defendants' second and third contentions are related. Defendants contend they had no duty to warn of a danger known to the user and that any warnings given were adequate as a matter of law. Initially, it should be noted that this is not the place to decide if plaintiff assumed the risk. That issue is considered later. Here, the only question is whether plaintiffs proved defendants had a duty to warn and breached that duty.

■ Obviously, a manufacturer is not required to produce a product incapable of causing injuries, but where an unavoidably unsafe product is manufactured, then the manufacturer may be required to warn potential users. If the warning is adequate, the consumer would proceed to use the product at the consumer's own risk. In order to decide if the warning is adequate, the courts must find it is adequate to perform the intended function of risk reduction. (*Palmer v. Avco*

*Distributing Corp.* (1980), 82 Ill. 2d 211, 412 N.E.2d 959.) Whether there was a duty to warn is, in the first instance, a question of law and, for the purpose of determining the existence of such a duty, the manufacturer is held to the degree of knowledge and skill of the experts. (*Peterson v. B/W Controls, Inc.* (1977), 50 Ill. App. 3d 1026, 366 N.E.2d 144.) However, the question of whether a product is unreasonably dangerous because the warnings are *inadequate* is a question of fact for the jury. Such warnings may be found to be inadequate if the warnings fail to specify the risk presented by the product, if the warnings are inconsistent with how the product is to be used, if they fail to advise of the reason for the warnings, or if the warnings do not reach the foreseeable users. *Collins v. Sunnyside Corp.* (1986), 146 Ill. App. 3d 78, 496 N.E.2d 1155.

█ █ Three experts testified these warnings on the labels were not adequate. The data sheets never got to the foreseeable users. Although plaintiff was an experienced painter and may have known there was some danger from painting with epoxy paint, the experts clearly testified that the language on the label would not sufficiently apprise a user of the precise equipment needed for the user's protection and that the product was dangerous regardless of the ventilation in the work area. The only purpose of the warning is to apprise the person who would use the product so as to make that person aware of the danger, enabling that person to protect himself. (*Collins*, 146 Ill. App. 3d 78, 496 N.E.2d 1155.) Only where the danger is fully obvious and generally appreciated will the courts find that no duty to warn exists. *Jonescue v. Jewel Home Shopping Service* (1973), 16 Ill. App. 3d 339, 306 N.E.2d 312; *Morgan v. Bethlehem Steel Corp.* (1985), 135 Ill. App. 3d 242, 481 N.E.2d 836.

Under the facts of this case, it would appear the warnings were not adequate. Furthermore, there was sufficient evidence of this inadequacy to establish this element of plaintiff's *prima facie* case.

██ Defendants next contend plaintiff failed to prove a proximate causal connection between the failure to warn and the injury. Plaintiff was painting and became ill. The issue of proximate cause is a jury question, and once the jury has decided the question, as long as there is some basis in the evidence for the determination, a reviewing court will not overturn that finding even though there may be other possible causes. (*Wells v. Web Machinery Co.* (1974), 20 Ill. App. 3d 545, 315 N.E.2d 301.) The dangerous condition need not be the *sole* proximate cause of the injury, but only *a* proximate cause. *Soto v. E.W. Bliss Division of Gulf & Western Manufacturing Co.* (1983), 116 Ill. App. 3d 880, 452 N.E.2d 572.

■■ There is sufficient evidence for the jury to find the failure to adequately warn was the proximate cause of the injury. Defendants keep returning to the argument of plaintiff's own action as an intervening cause, but it would seem there is sufficient evidence for a *prima facie* case, and any action by plaintiff which might arguably have added to the danger should be considered under the issue of whether plaintiffs assumed the risk. Here the experts stated the warning was not adequate to advise that the ventilation was insufficient to provide safety or that the type of mask used by plaintiff was inadequate. The evidence does not establish plaintiff knew the mask was inadequate and proceeded anyway, as in *Schroeder v. Reddick Fumigants, Inc.* (1984), 128 Ill. App. 3d 832, 471 N.E.2d 621.

The final contention is that plaintiff's injury and its causative connection to the exposure to the product was not established by competent medical evidence. This contention really has three parts: (1) plaintiff failed to prove he was injured; (2) there was no objective proof of this mental injury; and (3) the medical evidence tendered was speculative.

According to defendants, only Morhaim, a general practitioner, testified to the causal connection. Defendants complain Morhaim's testimony is speculative because he is not an "expert." Defendants complain further that Morhaim admitted he was not a specialist and would defer to the opinion of the specialists. However, no specialist directly contradicted his testimony. Lastly, defendant complains that no objective tests showed defendant had the condition diagnosed.

■■ An expert is a person possessing special skill or knowledge beyond that of the average layperson. The determination of an expert's qualification rests in the sound discretion of the trial court and will not be overturned on review in the absence of an abuse of discretion. The weight to be accorded to the testimony of such an expert in light of the witness's creditability is a matter for the jury to determine. (*Buckler v. Sinclair Refining Co.* (1966), 68 Ill. App. 2d 283, 216 N.E.2d 14.) Of course, on cross-examination the doctor's testimony may be discredited, but if counsel has succeeded in discrediting the value of the witness's opinion, that would be reflected in the jury verdict. *Theodosis v. Keeshin Motor Express Co.* (1950), 341 Ill. App. 8, 92 N.E.2d 794.

■■ Morhaim clearly has more specialized knowledge than a layperson concerning the matters about which he testified; therefore, he was properly allowed to testify as an expert. Defendants' counsel tried to discredit his opinion, but apparently did not succeed. Therefore, not only has plaintiff supplied evidence sufficient to present a

*prima facie* case, but the evidence also satisfies the manifest weight challenge.

■■ Defendants next argue that Illinois courts do not allow recovery for purely emotional and mental injuries in strict liability cases. (*Woodill v. Parke Davis & Co.* (1980), 79 Ill. 2d 26, 402 N.E.2d 194; *Rahn v. Gerdts* (1983), 119 Ill. App. 3d 781, 455 N.E.2d 807.) This is a correct statement of law, but it ignores the facts.

■■ Some experts testified plaintiff suffered from an organic brain syndrome. This was defined as an actual abnormality in the brain, not a mental or emotional illness. Tobin, defendants' own expert, testified plaintiff had organic brain syndrome initially, recovered, and was now suffering from the psychological effects of the illness. This was Tobin's explanation for the failure of the tests to produce objective findings.

The fact that some doctors who later tested plaintiff could find no objective test results, questioned whether the plaintiff's behavior was consciously motivated, and could not opine as to the cause of plaintiff's condition to a reasonable degree of medical certainty, does not render the opinion of other doctors who testified speculative, conjecture, or mere guesswork as a matter of law. The jury was entitled to consider all the evidence, and the plaintiffs made out a *prima facie* case in strict liability.

The second issue to consider is whether the trial court erred in allowing plaintiffs to amend the complaint on the first day of trial to seek recovery on the theory defendants violated State and Federal toxic disclosure provisions. The defendants contend the trial court committed reversible error for three reasons. First, defendants complain the trial court committed an abuse of discretion by allowing plaintiffs to amend the complaint on the first day of trial. Second, defendants suggest the trial court erred by failing to strike the added portions in the amended complaint because the statute cited in the complaint does not impose a duty owed by defendants to plaintiffs. Third, defendants argue the instructions were erroneous.

■■ ■ A trial court has broad discretion regarding the allowance of amendments to pleadings prior to the entry of final judgment, and the trial court's ruling will not be overturned by an appellate court in the absence of a showing of manifest abuse of discretion. (*Austin Liquor Mart, Inc. v. Department of Revenue* (1972), 51 Ill. 2d 1, 280 N.E.2d 437.) Defendants cite *North Shore Marine, Inc. v. Engel* (1980), 81 Ill. App. 3d 530, 401 N.E.2d 269, which holds that once the trial has begun, an amendment of a pleading which would change the nature and quality of the proof should not be allowed with

regard to matters of which the pleading party had full knowledge at the time the original pleading was filed and where no excuse is demonstrated for not pleading the matter in the original pleading.

 In the case at bar, the trial had not started. Furthermore, the discovery established that no material safety data sheet had ever been provided. The evidence at trial confirms this fact. Although a prior sale had been made in February 1984, at no time had a material safety data sheet been provided to Carle.

Therefore, the issue of the material safety data sheet was no surprise to defendants and certainly did not alter the nature and quality of the proof. Clearly, the trial court did not commit an abuse of discretion in allowing the amendment to plaintiffs' complaint.

 The Illinois Supreme Court recently discussed the elements which plaintiff must prove in order to recover from defendants for a statutory violation (*Dunn v. Baltimore & Ohio R.R. Co.* (1989), 127 Ill. 2d 350, 367):

"In order to recover for a defendant's violation of a statute or rule designed to protect human life or property, a plaintiff must show: (1) the violation proximately caused the injury; (2) plaintiff belonged to the class of persons whom the rule was intended to protect from injury; and (3) the kind of injury suffered by plaintiff was the kind of injury which the rule sought to prevent. *Barthel v. Illinois Central Gulf R.R. Co.* (1978), 74 Ill. 2d 213, 219-20."

The question of proximate cause has already been discussed, and we noted the failure to adequately warn, including the failure to supply a material safety data sheet, has been adequately established by the evidence.

Defendants' complaint that the statute does not create a duty owed to plaintiffs is frivolous. While the statute requires the supply of the material safety data sheet to the purchaser, supplying the data sheet is obviously required to protect the persons who are using the product, oftentimes employees of the purchaser. Therefore, the breach of a duty to supply the purchaser with a material safety data sheet is a breach of a duty to warn of a known danger in a product so as to protect the ultimate user of the product. And, it is precisely this type of injury which is sought to be prevented.

Lastly, defendants complain of the instructions. The issues instructions refer to the failure to supply the material safety data sheet within 30 days as one of the ways defendants made the product unreasonably dangerous. Also given was plaintiffs' instruction No. 27A (Illinois Pattern Jury Instructions, Civil, No. 60.01 (2d ed. 1971) modi-

fied, based on Ill. Rev. Stat. 1985, ch. 48, pars. 1411, 1419 (paragraph 1419 repealed effective September 4, 1986)) as follows:

"There was in force in the State of Illinois at the time of the occurrence in question a certain statute which provided that:

'Any person, including any supplier, importer or manufacturer, who sells any toxic substance within the State of Illinois must provide the buyer, within 30 days of the date of receipt, with a material safety data sheet for the toxic substance and must label the container with the chemical name and appropriate hazard warning.'

As used in this statute, 'toxic substance' includes the following:

Toluene
Ethylene Glycol Monoethyl Ether
Propylene Glycol Monomethyl Ether
Butyl Alcohol

If you decide that a party violated the statute on the occasion in question, then you may consider that fact together with all the other facts and circumstances in evidence in determining whether or not the product was unreasonably dangerous at the time of the occurrence."

In their brief, defendants argue merely that the imposition of a duty owed by defendants to plaintiffs under this statute is unfair and, therefore, the giving of the instruction was erroneous. With regard to these instructions, defendants did object at the instruction conference that statutory violations were not appropriate in strict liability cases since the IPI 60.00 series was included in the negligence section and that the instruction did not include all the toxic substances listed in the statute. As to plaintiffs' instruction No. 27A, defendants specifically relied on the failure to include the entire list of statutory toxic substances in the instructions, even though many of those listed in the statute were not included in the product which was the subject of the lawsuit. The trial court stated that had defendants tendered an alternative instruction including all statutorily listed toxic substances, the trial court would give defendants' tendered alternative. However, since defendants failed to tender such an instruction, the trial court gave plaintiffs' instruction No. 27A. This argument is not raised on appeal, however, nor is the argument that the IPI series 60.00 instruction on statutory violations cannot be used in strict liability cases. Here, defendants merely rely on the argument that defendants owe no such duty to plaintiffs. Plaintiffs suggest, therefore, that since defendants did not raise this particular argument concerning plain-

tiffs' instruction No. 27A at trial, defendants have waived the argument on appeal. *Rhodes v. Oliva* (1973), 13 Ill. App. 3d 849, 301 N.E.2d 126.

■ Perhaps defendants did not specifically refer to this precise argument in relation to plaintiffs' instruction No. 27A. However, this argument was raised at other times in the instruction conference and is, therefore, not waived. The trial court properly determined that a violation of the statute is a violation of a duty to the ultimate user of the product. Therefore, the instruction given was proper.

The next issue to consider is whether the trial court improperly excluded evidence of Ted's out-of-court statement. When Peters was being examined by plaintiffs' attorney on direct examination, the witness was being asked about equipment provided by Carle. The witness was asked about conversations he had with Ted, to which Carle's attorney objected. Defendants' attorney made no argument whatsoever concerning this testimony.

When Charles Kenneth Woolridge, a maintenance electrician at Carle, was testifying, he was asked on direct examination by plaintiffs' attorney to relate a statement made by Jim Grove, mechanical supervisor. The objection of Carle's attorney was based on hearsay. Plaintiffs' counsel contended that the supervisor was an agent of Carle. Carle's attorney responded by saying there was no contention the statement was an admission. After a bench conference out of hearing of the court reporter, the objection was sustained. Again defendants' attorney made no argument in the record. Later on in the same direct examination, this witness was asked to relate a conversation with Charles Bell, the painting and carpentry supervisor. Again Carle's attorney objected based on hearsay. Defendants' counsel *joined in the objection*, pointing out that while this may be an admission which is an exception to the hearsay rule, a proper foundation had not been laid. The court ruled it was hearsay and sustained the objection.

Finally, when Woolridge was testifying on cross-examination by defendants' attorney, he was asked to relate a conversation between himself and Ted concerning the condition of the mask. Carle's attorney objected. Defendants' attorney advised the court that this matter goes to the question of assumption of risk and misuse of the product. Initially, the court overruled the objection. The following colloquy took place:

> "A. [By Woolridge:] This was in another area that they were painting in, and we were discussing the mask, Mr. Byrne and myself, and Mr. Peters, and they asked their supervisor, which was Charlie Bell at that time, for a new mask, and he just said,

It's getting bad, and we need a new one.

[Counsel for Carle]: Judge, we will ask for a limiting instruction at this time.

THE COURT: May I see counsel up here, please? I understand you have an alternative motion to articulate for the record, counsel.

[Counsel for Carle]: Your Honor, at this time I would like to move to strike the question and answer that were posed by Mr. Tague.

THE COURT: For the record, I am going to permit the motion. Strike the last question asked and answer given, and instruct the jury to disregard each of those.

Q. [Counsel for *defendant*]: Let me ask you a different question, Mr. Woolridge. Did Mr. Byrne ever indicate to you that he needed a different organic vapor respirator, because he thought that these fumes would be hazardous to his health?

[Counsel for plaintiffs]: Objection, Your Honor. He is trying to prove contributory negligence, and it's not a defense for using a dangerous product.

THE COURT: Sustained."

Defendants now argue that the trial court improperly ruled on these objections because the statements were admissions against the interest of one of the parties and are therefore exceptions to the rule prohibiting hearsay testimony. However, it would appear defendants only have standing to complain about this very last series of objections during the cross-examination of Woolridge.

 Defendants argue these statements are relevant and material to the questions of Ted's knowledge of the danger, Ted's proceeding in the face of a known danger, and Carle's knowledge of the danger. Nothing in the record indicates the basis for the trial court's first ruling. Defendants only assume the ruling is based on hearsay. Furthermore, the witness could have answered the last question in the negative. No offer of proof was ever tendered. This court cannot determine the propriety of the trial court's ruling if the record does not disclose what the testimony would have been. (See *Volvo of America Corp. v. Gibson* (1980), 83 Ill. App. 3d 487, 404 N.E.2d 406.) Closely related to this evidentiary issue is the issue of whether the trial court properly directed a verdict as to affirmative defenses.

 ██ The parties agree that contributory negligence is not a bar to recovery in strict liability, and the plaintiffs need not plead or

prove that Ted was in the exercise of due care at the time of the incident which caused the injury. (*Sweeney v. Max A.R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170.) Of course, even in negligence actions, the law in Illinois has moved away from the need to prove lack of contributory negligence. Now, the courts look to the comparative fault of the parties in assessing awards. While contributory negligence was never a defense in strict products liability cases, misuse of the product and assumption of the risk were defenses which could be interposed as an absolute bar to recovery. (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) But now, comparative fault has also been applied to strict liability cases, such that the former defenses are merely damage-reducing factors. (*Coney v. J.L.G. Industries, Inc.* (1983), 97 Ill. 2d 104, 454 N.E.2d 197.) And the practical confusion arises, as always, in the fine distinctions between assumption of risk and contributory negligence, particularly now in light of the fact that comparative fault in strict liability cases does not encompass plaintiff's contributory negligence. See *Simpson v. General Motors Corp.* (1985), 108 Ill. 2d 146, 483 N.E.2d 1 (compare majority and dissenting opinions).

 In defendants' brief, defendants' argument is limited to the defense of assumption of risk. Therefore it seems appropriate to conclude defendants waive any argument as to misuse of the product.

 ██ Whether plaintiff assumed the risk is a jury question (*Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305) to be determined in light of the plaintiff's knowledge, experience, and background. (*J.I. Case Co. v. McCartin-McAuliffe Plumbing & Heating, Inc.* (1987), 118 Ill. 2d 447, 516 N.E.2d 260.) Assumption of risk may be inferred from evidence which tends to show plaintiff was actually aware of the defective nature of the product, appreciated that the product was unreasonably dangerous and, in spite of this knowledge, proceeded to utilize the product voluntarily in disregard of the danger. (*Thomas v. Kaiser Agricultural Chemicals* (1980), 81 Ill. 2d 206, 407 N.E.2d 32.) The voluntariness of exposing himself to the known danger is no less voluntary merely because plaintiff believed that he would lose his employment if he failed to proceed. *Fore v. Vermeer Manufacturing Co.* (1972), 7 Ill. App. 3d 346, 287 N.E.2d 526.

 ██ In striking or directing a verdict as to an affirmative defense, the court must determine that, in viewing all the evidence in a light most favorable to defendants, the evidence was so overwhelmingly in favor of plaintiffs that a jury verdict in favor of defendants could never stand. (*Williams*, 45 Ill. 2d 418, 261 N.E.2d 305; *Pedrick*

*v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) In light of this standard, the court's ruling appears to be correct, as does the court's ruling on the evidentiary matters in the foregoing issue.

The evidence does not establish the plaintiff appreciated, or could appreciate, the risk involved. Plaintiff may have once complained that the mask was weather-cracked. Plaintiff may have stated the mask was not working. Even if he asked for a new mask and received one, it may not have solved the problem, because no one appreciated that the type of mask being used was inappropriate. Nor is there evidence plaintiff understood what defendants meant by "Good Ventilation," since the experts clearly agreed that even if plaintiff was painting outdoors he would still need a mask. And this could explain why plaintiff partially closed off the room in plastic sheeting. Plaintiff was not advised of the need to utilize an air-supplied respirator, and therefore, he could not possibly have proceeded in the face of a known danger. Such a conclusion is supported by the permissive and optional language in the warnings on the labels and the fact that new warnings were later placed on the labels of this product.

Plaintiff told a fellow worker he was aware there was some danger from epoxy paint if the correct equipment was not used. That is not to say plaintiff knew which equipment was the correct equipment to utilize with this particular paint. Contrary to the assertion in defendants' brief, there is no evidence plaintiff requested a different respirator because he thought the fumes were dangerous. This is the very question which was objected to on the ground it pertained to contributory negligence, and the objection was sustained. The evidence indicates that because of the inadequate warning on the label and the failure to supply a material safety data sheet, plaintiff was never aware of what type of equipment was necessary to protect him from this product. Nor is there evidence plaintiff was aware the product could cause damage to the central nervous system. Therefore, even if plaintiff may have been negligent in not checking further into the correct equipment, such contributory negligence is *not* a damage-reducing factor in strict liability cases.

Lastly, we consider whether the trial court erred with regard to the rulings on the third-party complaint for contribution against plaintiff's employer. On appeal, defendants challenge three rulings by the trial court: (1) striking paragraph 10(c); (2) granting a partial summary judgment; and (3) directing the verdict as to the ventilation issues. On the question of striking paragraph 10(c), Carle cites no cases but points to the argument presented in the trial court: (1) the allega-

tion of the supervisor's knowledge in paragraph 10(c) is a duplication of the allegation in paragraph 10(d) which was allowed to stand; and (2) no obligation is placed on Carle by reason of Ted complaining about his illness which *he thought* was caused by the fumes.

Paragraphs 10(c) and (d) state as follows:

> "10. At said time and place, Third-Party Defendant, Carle Foundation Hospital, was guilty of one or more of the following negligent acts or omissions:
>
> * * *
>
> (c) its maintenance supervisory employees ordered Plaintiff to continue painting in the room after Plaintiff told the Supervisor he was not feeling well due to what Plaintiff thought to be inhalation of fumes, when such supervisors knew, or should have known Plaintiff was painting contrary to the directions and warnings provided with the product;
>
> (d) directed or permitted painting contrary to the instructions and warnings on the product regarding ventilation and use of respirators or masks; copies of the product allegedly used by the Plaintiff are attached hereto as Exhibit 'B'."

Although the issue of Carle's knowledge of the danger is preserved in paragraph 10(d), it probably was error for the trial court to strike paragraph 10(c), since nowhere else is there an allegation that the knowledge of the danger was raised by Ted stating he was ill. This was a warning Carle allegedly ignored. Nevertheless, any error in striking the allegation must be considered harmless because evidence was presented at trial relating to Ted being told to return to work after his becoming ill. This evidence was before the court at the time the verdict was directed in favor of Carle, and therefore this issue is merged into the issue concerning the propriety of directing a verdict. Similarly, the facts were testified to in the depositions attached to the motion for summary judgment and those tendered in opposition thereto. In any event, defendants do not now argue the trial court erred because paragraph 10(c) is the only paragraph alleging notice to Carle by reason of Ted advising his supervisor he was ill.

In their brief, defendants merely argue that paragraph 10(c) states a cause of action because an employer may be held to contribute to a plaintiff's injury by disregarding instructions or negligently failing to instruct an employee in the proper use of the product. While this is true, such a theory of recovery would be sufficiently preserved by the allegation in paragraph 10(d).

On the propriety of granting summary judgment, the defendants put forth three contentions: (1) the designation of the Glaze and John-

ston depositions was timely and the trial court erred by refusing to consider them; (2) summary judgment was granted on issues as to which genuine issues of material fact remained; and (3) no expert testimony was required concerning ventilation and respirators.

The hearing on the motion for summary judgment was held October 15, 1987, at which time the motion was allowed in part and denied in part, with a written order to be entered later. At that time, neither Glaze nor Johnston had testified at trial. The order entered struck the tendered excerpts from these depositions.

While defendants point to section 2—1005(c) of the Illinois Code of Civil Procedure (Code) (Ill. Rev. Stat. 1987, ch. 110, par. 2—1005(c)) for the proposition that a party opposing a motion for summary judgment may file counteraffidavits "prior to or at the time of the hearing on the motion," defendants fail to demonstrate how the depositions of Glaze and Johnston could have benefitted defendants. The trial testimony of these two experts seems to exculpate Carle. Although the trial court may have erred in refusing to consider the tendered depositions, such error cannot be considered reversible unless defendants demonstrate in what way they have been prejudiced by the ruling.

The court ruled that expert testimony was required on the question of whether an appropriate respirator or mask was supplied by Carle. First defendants argue this finding is incorrect. But if defendants' position is correct, then defendants' argument on the need for Glaze's and Johnston's depositions is moot. So, in the alternative, defendants argue that if expert testimony was required, the defendants should have been allowed to use the depositions of Glaze and Johnston.

In order to shorten this analysis somewhat, let us assume for the sake of argument that the trial court erred in refusing to consider portions of the depositions of Glaze and Johnston. According to defendants' brief, Glaze stated in his deposition that because of the size of the room, the vapor would displace and deplete the oxygen and plaintiff should have been provided with a NIOSH-approved respirator with a self-contained breathing capability, or an air tank. Monitoring devices could be purchased to determine if the respirator was working. The room should be well-ventilated and two air exchanges per minute in the room would still require an air-supplied respirator. Johnston would add that using a dust or particle mask lacking an organic vapor cartridge while painting in a closed area would make the epoxy product dangerous.

Since the contribution action against Carle is based on negligence

and not strict liability, how can these facts create a genuine issue of fact as to Carle's liability? The expert testimony would only conclude that the safety apparatus was required and not that Carle knew, should have known, or should have investigated the need for a specific type of safety apparatus.

If we assume defendants' alternative argument that expert testimony is not needed to defend the motion for summary judgment on the contribution action against Carle, then this court need only consider the propriety of the ruling based on the facts before the trial court at that time. A product liability action does not always require expert testimony to establish liability, for expert testimony need be presented only where the subject matter of the litigation is beyond the realm of knowledge and experience of ordinary people. For example, ordinary people can determine whether a spray gun without adequate guards or other safety devices was unreasonably dangerous. *Eberle v. Brenner* (1985), 131 Ill. App. 3d 394, 475 N.E.2d 639.

But the existence of an unreasonably dangerous condition is not the basis of liability for Carle. Where there is no evidence indicating the employer was ever advised by the manufacturer of the danger inherent in the product, there must be some evidence that the employer breached some standard of care for the protection of the employees by failing to investigate. With or without the depositions of Glaze and Johnston, there is no evidence that Carle knew or should have known a respirator was necessary for Ted's protection. Nor did defendants present any testimony of experts to demonstrate the existence of any industry standards establishing this duty on the part of Carle.

The standards for granting a summary judgment have previously been reviewed in *Reed v. Bascon* (1988), 124 Ill. 2d 386, 393, 530 N.E.2d 417, 420, wherein the Illinois Supreme Court stated:

"Section 2—1005(c) of the Civil Practice Law (Ill. Rev. Stat. 1985, ch. 110, par. 2—1005(c)) provides that summary judgment shall be granted 'if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Although summary judgment is to be encouraged as an aid in the expeditious disposition of a lawsuit (*Allen v. Meyer* (1958), 14 Ill. 2d 284, 292), it is a drastic measure and, therefore, should be allowed only when the right of the moving party is free from doubt (*Purtill v. Hess* (1986), 111 Ill. 2d 229, 240; *Beverly Bank v. Alsip Bank* (1982), 106 Ill. App. 3d 1012, 1016). The court must construe the pleadings, depositions, admissions, exhibits,

and affidavits on file strictly against the movant in determining whether a genuine issue of material fact exists. *Kolakowski v. Voris* (1980), 83 Ill. 2d 388, 398."

Defendants contend there was conflicting evidence creating factual questions. According to defendants, the materials submitted by Carle in support of the motion for summary judgment alone created factual issues. In addition, defendants argue that the depositions of Peters and Woolridge submitted in opposition to the motion sufficiently contradicted the material submitted by Carle to create genuine issues of material fact. The following facts are those from the depositions which defendants believe support their position.

Charles Bell was the plaintiff's immediate supervisor at the time of the incident. As supervisor, Bell controlled and supervised the plaintiff, and was responsible for directing the plaintiff's work. He was also responsible for maintaining and providing the needed equipment for plaintiff. Although he had never been trained in safety procedures, he was responsible for giving the painters safety instructions, such as the wearing of masks and rubber gloves. Bell relied on the painters and their knowledge of painting and relied on them to tell him what safety equipment was needed. He denied the painters ever indicated that the mask made available by the hospital was not functioning properly and denied that a painter ever requested equipment which he refused to obtain.

He told the plaintiff to paint the pathology lab and was responsible for deciding which paint to use. Bell admitted to reading the labels which were on the cans which plaintiff used, which were exhibits at his deposition, but testified that he only read them to determine that the two components had to be mixed. He denied seeing the multiple warnings on the labels. However, he admitted knowing that anyone who paints should paint with adequate ventilation, which is why he told the plaintiff to wear the mask.

The hospital had a mask or respirator which Bell considered to be a NIOSH-approved organic vapor respirator. It was a rubber mask with a place for two canisters on the side and was supposed to have a charcoal filter. Bell advised plaintiff to use the mask, figure out what it takes to bring the mask up to standard, and if the fumes got to him, leave the room until the exhaust fan clears out the odors. The safety coordinator, Earl R. Williams, testified that he did not know if there were any canisters at the hospital. Williams did not know for which type of paint this mask was appropriate. There were no air-supplied respirators available to the painters prior to the incident. Bell had never seen any instructions on the use of the mask. Neither Bell

nor Williams knew if the mask had ever been maintained, changed, or serviced. A special painter's air-supplied respirator which was different from the old masks was obtained after the incident.

Bell maintained the air ventilation system in the pathology lab was sufficient ventilation, even though he was aware of the plastic sheeting. He nevertheless felt the plaintiff should have worn a mask. At one point, the fumes were so bad, it was necessary to order the plaintiff to stop painting. He admitted that even with that ventilation system, he felt that he had to get a box fan to help disperse the fumes. Williams testified that the buildup of fumes was so bad that employees complained and nurses were concerned for the patients.

Williams felt that precautions had been taken for the plaintiff since there was a ventilation system, he had propped open a door, and an exhaust fan and a mask were provided, even though he did not know if this particular mask was proper protection when using epoxy. He admitted that he did not know if the ventilation was functioning, even though he had been in the lab on the second day of painting.

Plaintiff told Williams that he had worked with epoxy for five years and knew it was dangerous. Plaintiff also told Williams he knew that the area had to be well-ventilated and complained about the unsafe working conditions, but some unidentified person told him to "go paint," so he went and painted.

Peters had been the plaintiff's fellow painter under Bell's supervision. Contrary to Bell's testimony, Peters stated Bell had refused to obtain the respirator which the painters had requested prior to the plaintiff's incident. Peters showed Bell a picture out of a painting journal of the NIOSH respirator the painters needed within a year prior to the incident. Bell refused to get some new products because he "had his own idea of doing things *** and [if] he didn't like it, then he wouldn't get it for us."

Peters and plaintiff had used the Glidden epoxy about six months prior to the incident. The only masks the hospital had provided were surgical masks. These masks helped a little, but did not successfully filter out all the fumes.

On the day of the incident, Ted was only provided a mask with a cotton insert. The charcoal filters were not supplied in the paint shop. Peters personally saw Ted painting and wearing the old mask. This mask did not fit tightly. On the day in question, Ted told Peters that Bell had refused to replace the mask. When Woolridge, an electrician, saw Ted, he was wearing a plain, old mask which was badly cracked from wear and which had been around as long as he had worked there, or about seven years. Woolridge knew at the time that the

mask was improper because he had received training in toxic substances prior to the incident. No one from the painting section, however, took this course. Woolridge stated that the fumes where Ted was painting were so strong he got a headache within three minutes.

When Peters opened the door, "the vapors about knocked me down." Peters told Ted to stop painting, but Ted was afraid to because he had prior problems with Bell. He reported that Bell had come in and covered an air duct with plastic even though he was complaining about the fumes. This plastic sheeting was placed outside the pathology room.

The smell and fumes extended about 150 feet down a corridor. A mechanical supervisor, Jim Grove, came by while Ted was painting. Woolridge was working in an adjacent area. Grove said the fumes were extending to other floors and "[p]eople are having a fit." Doctors, nurses, and hospital couriers had been complaining about the smell. Ted told Woolridge that he had complained to his supervisors about the fumes, being sick, and that the mask was not functioning on the day in question. Ted also told Woolridge the day before that he had read an article on how dangerous epoxy could be and that he had showed it to Bell, but Bell thought Ted was just trying to get out of work. Ted wanted to paint at night when the area could be opened up.

The hospital brought a box fan into the area in an attempt to clear the fumes. This fan was not made for this purpose, but was meant to draw off sawdust. It simply collected the air and blew it back into the room.

After the incident, signs were posted that chemical masks were required for painting and employees were subject to discipline if not used. A new mask was purchased which had a chemical filter which has cartridges on the side and replaceable filters for chemicals. In addition, two air-supplied respirators were purchased for the painters to use. The hospital now advises some employees that they do not have to work in an area where epoxy is being used. Safety meetings have become popular in the hospital only since the incident.

Defendants conclude that this deposition evidence raises a reasonable inference that the ventilation was not adequate, Carle's employees knew this, and that the employer should have taken some protective action. As to ventilation issues, however, the trial court did not grant summary judgment. Defendants further contend these depositions create a genuine issue of material fact as to whether Carle acted properly in failing to provide the appropriate respirator for Ted. In support of the summary judgment, Carle points to the following addi-

tional facts.

The exhibit containing Dr. Main's testimony established that when the amount of material in the air is below a threshold level, no respiratory protection is required. No measurements were ever made. The testimony of Alan Todd, defendants' expert, suggests that the pathology lab could not be considered a confined space under any circumstances. The warning labels in this case indicate an air-supplied respirator is only needed in confined areas, and even then the language is optional and permissive, rather than mandatory.

"Exposure controls *may* require use of a NIOSH approved combination vapor/particulate *or* supplied air respirator." (Emphasis added.)

Defendants argue Carle was negligent because a proper respirator was not supplied. What defendants failed to establish by the discovery submitted in opposition to the motion for summary judgment is that Carle had a duty, in spite of the inadequate warnings, to make tests or inquiries concerning the need for a respirator, or that Carle should have known the information on the labels was unreliable even though defendants failed to supply material safety data sheets which explicitly explained the dangers and necessary precautions.

■■ While the trial court's reasoning is not expressed in the record, other than to accept the arguments of Carle's counsel, it would seem the trial court believed Carle's employees would use common sense with regard to ventilation, but since Carle had supplied a mask, it would take more than mere common sense for these same employees to conclude that, given the language in the labels, a supplied-air respirator would be required when the product was applied under the circumstances of this case. Even if Glaze's and Johnston's depositions were considered, this duty to discover the danger in spite of the warnings was not established by said testimony. For these reasons, the granting of summary judgment was appropriate.

■■ ■ The final contention is whether the trial court properly directed a verdict on the ventilation issues at the close of the evidence. A motion for a directed verdict may not be granted unless the evidence, when viewed in the light most favorable to the nonmoving party, here the defendants, so overwhelmingly favors the movant as to require a verdict in the favor of the movant, here Carle. *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.

In arguing against the motion for directed verdict, defendants' trial counsel was placed in an awkward position, on one side arguing the ventilation was adequate to combat plaintiffs' claims and on the other side arguing the issue of adequate ventilation should neverthe-

less be submitted to the jury in order to keep the contribution action in the case. Contrary to Carle's contention, however, this issue was argued at the post-trial level and is not waived by defendants for purposes of appeal.

Defendants' problem is not the argument, it is the evidence. The product was inherently dangerous. The defect was the inadequacy of the warning. Experts testified that even if the painting was done outdoors, a proper mask must be used. Therefore, although the ventilation was a condition, it was not a contributing cause. Even if Ted was painting outside, the use of the wrong mask would endanger his safety. There was apparently no evidence of what the ventilation or the rate of air exchange actually was in the pathology lab, of what it should have been, of how it was affected by the plastic sheeting, other than at one time a duct may have been covered, or of what steps the hospital could have taken, but did not take, to improve the ventilation in that room. The trial court properly directed a verdict on the ventilation issues within the third-party contribution action at the close of the evidence.

For the foregoing reasons, the judgment of the circuit court of Champaign County is affirmed.

Affirmed.

McCULLOUGH, P.J., and KNECHT, J., concur.